William K. MCMAHON, Petitioner,

v.

Gary HODGES, Warden, Gowanda Correctional Facility, and the Attorney General of the State of New York, Respondents.

No. 99 CIV. 10116(DC).

United States District Court, S.D. New York.

Sept. 26, 2002.

William A. Gerard, Esq., Palisades, NY, for Petitioner.

Michael E. Bongiorno, Esq., District Attorney of Rockland County by Ellen O'Hara Woods, Esq., Senior Assistant District Attorney, New York City, for Respondents.

### OPINION

CHIN, District Judge.

In 1995, petitioner William K. McMahon and Ronald Hall were arrested and indicted in Rockland County for kidnapping, unlawful imprisonment, attempted rape, and assault. Their cases were severed. Hall was tried first and he was convicted by a jury on three of four counts.

The state court judge who presided over Hall's trial was scheduled to try McMahon's case as well. On the eve of trial, at a conference with the parties, the judge tried to negotiate a plea. The judge made several statements that led McMahon and his lawyer to conclude that the judge could not be fair; among other things, the judge alluded to the "powerful" evidence he had seen at Hall's trial that would be admissible against McMahon at his trial, and suggested that McMahon plead guilty to avoid consecutive sentences for multiple crimes.

McMahon moved for the judge's recusal. The judge initially denied the motion, but later offered to transfer the case to another judge *if* McMahon would waive his right to a trial by jury. McMahon accepted the offer. The case was transferred to a different judge, who tried the case without a jury. McMahon was convicted of kidnapping, attempted rape, and assault.

McMahon petitions this Court for a writ of habeas corpus, raising two issues. First, he contends that his right to due process was violated because the first state court judge was biased and prejudiced. Second, he contends that he was deprived of due process and his right to a jury trial because the judge conditioned his recusal on McMahon's waiver of his right to a jury. Because I conclude that McMahon's waiver of his right to a jury was involuntary, the petition for a writ of habeas corpus is granted.

### BACKGROUND

#### A. The Facts

##### 1. The Assault

On September 24, 1995, McMahon and his brother-in-law, Hall, were drinking alcohol in the McMahon family home, where they were both temporarily residing at the time. At approximately 5 p.m., a woman who was renting a room in the house arrived home. McMahon offered the woman a beer, and Hall asked her to expose her breasts to him. She refused, and began to walk down the hallway toward her room. The men then accosted her, grabbing her by her hands and feet, and carried her to another bedroom in the back of the house. (Trial Transcript ("T.Tr.") at 657:6–8, 665:6–7, 660:8–9, 662:24–679:22).

The woman struggled to free herself. The men took turns striking and kicking her, cursing and threatening her with further harm. At Hall's suggestion, McMahon located some duct tape, and the men bound her wrists and ankles and wrapped the tape around her head, covering her mouth. Hall told her that she was going to die and that no one would hear her scream. (*Id.* at 680:4–695:9).

Hall also threatened the woman with rape. She testified that McMahon tried to discourage Hall, saying, "Don't do that. Don't do it, man. Come on, what are you doing?" (*Id.* at 691:4–18). Hall pulled down the woman's pants and underwear, and unzipped his own pants. Hall did not, however, attempt to rape her. Instead, he urinated on her. McMahon and Hall then laughed and told her that she needed to wash. She also testified that, later, Hall lifted an object over her head, stating, "I ought to crush your skull," but McMahon screamed at him to stop. Hall shouted that he was going to take her down to the river and dump her body. (*Id.* at 692:12–699:8).

At some point, the men began to argue over cigarettes and beer. The woman seized the opportunity to escape, running out of the apartment into the street and flagging a passing motorist. (*Id.* at 714:17–726:4).

## B. *The State Court Proceedings*

### 1. *McMahon and Hall Are Indicted*

On October 6, 1995, McMahon and Hall were charged in the County Court of the State of New York, Rockland County, with kidnapping in the second degree, N.Y. Penal Law § 135.20 (McKinney 1997), unlawful imprisonment in the first degree (*id.* § 135.10), attempted rape in the first degree (*id.* §§ 110.00, 135.35[1]), and assault in the second degree (*id.* § 120.05[2]). The defendants' cases were severed. (Pet. at 4).

### 2. *Hall's Case*

Hall was tried by a jury in May of 1996, before Orange County Court Judge Jef-

frey G. Berry. Hall was found guilty of kidnapping in the second degree, unlawful imprisonment in the first degree, and assault in the second degree; he was acquitted of attempted rape in the first degree. (*Id.*) Hall was sentenced to an indeterminate term of six-to-twelve years imprisonment for the conviction of kidnapping in the second degree, to run consecutively with concurrent terms of three and one-half-to-seven years imprisonment for the conviction of assault in the second degree, and two-to-four years imprisonment for the conviction of unlawful imprisonment in the first degree. On appeal, the kidnapping and unlawful imprisonment convictions were vacated, as were the sentences imposed thereon, as they were merged into the assault conviction; those counts of the indictment were dismissed. *People v. Hall*, 267 A.D.2d 473, 700 N.Y.S.2d 486, 486–87 (2d Dep't 1999), *lv. denied*, 94 N.Y.2d 920, 708 N.Y.S.2d 359, 729 N.E.2d 1158 (2000).

### 3. *McMahon's Case*

### a. *Pre–Trial Proceedings*

### (i) *The Ex Parte Conference*

McMahon's trial was scheduled to commence on June 11, 1996, also before Judge Berry. On that day, before jury selection, Judge Berry held an *ex parte* conference with the defense, at the defense's request, with the People's consent. (Pet. at 4). During this conference, which was not transcribed, counsel discussed certain evidence he intended to offer at trial to discredit the victim, including time records from McMahon's sister's employer, to support her testimony as to the time she arrived home on the night in question.[1]

---

1. Defense counsel viewed this evidence as particularly important because, according to Judge Berry, who had spoken with the jurors in Hall's case after the trial, they did not believe McMahon's sister's testimony that she had arrived home at 10 p.m. (Pet'r Obj. to

Mag. Judge's Report & Recommendation ("Pet'r Obj.") at 4). At the *Sandoval* hearing later that day, this evidence was again raised and rejected; the court's stated reasoning was that defense counsel could not "bolster [his]

(Pet'r Obj. at 5). Counsel asserts that in response to each piece of evidence he proposed, Judge Berry replied the evidence was inadmissible. Counsel claims he then provided the judge with authority for each evidentiary offer, but that the judge declined to read the materials, advising counsel to "take it up on appeal." (*Id.*).

#### (ii) *The Preliminary Conference*

Judge Berry also held a preliminary conference with the parties in his chambers, on the record. The judge inquired as to whether McMahon was willing to accept a plea, and stated, for the record, that he had had "extensive conversations" with both the People and the defense, separately and together. (T. Tr. at 2:19–25, 6:4–8). He explained that he held an *ex parte* conference with the defense "so [counsel] could explain to the [c]ourt some of his quote 'defenses' that he thought he would be entitled to in this case." (*Id.* at 6:8–14). The judge stated that "many of the items that [defense counsel] felt were applicable, [he] felt, for certain evidentiary reasons, might not be applicable and might not be as viable a defense" as counsel perceived. (*Id.* at 6:16–21).

Judge Berry also advised the defense that he had read McMahon's grand jury testimony and took it as an admission of guilt to the charge of unlawful imprisonment. Counsel stated that he believed any admission was to a charge of unlawful imprisonment as a misdemeanor only. (*Id.* at 7:10–17). The judge advised, however, that in light of the jury's verdict in Hall's case and the grand jury testimony in McMahon's case, McMahon was facing a "lot of exposure." He suggested that if McMahon accepted a plea, he could be out

of prison in a relatively short period of time. (*Id.* at 8:2–9:4). Judge Berry also warned counsel that if McMahon were convicted, "the People are within their rights to come in and argue that they want consecutive time" because, as he viewed the evidence in the first trial, it was "very clear to the [c]ourt" that the kidnapping and the unlawful imprisonment were separate and distinct from the assault and "in no manner whatsoever, in any constrained view of the evidence, could someone determine or claim that there should be a merger of those acts." (*Id.* at 9:17–10:8).[2]

#### (iii) *The Recusal Motion*

At some point during the conference, defense counsel remarked that "[he] would certainly appreciate it if the [c]ourt would not reach the conclusion that my client's guilty before the trial starts." He asked the court to keep an open mind "as [he and his client] stand here before Your Honor, not guilty." (*Id.* at 11:11–22). A discussion ensued, in part, as follows:

> THE COURT: ... I sat through the trial of this case already. I've heard the evidence in this case already. It was powerful evidence against Mr. Hall and against your client. I've read your client's Grand Jury testimony. That is extremely inculpating to the degree that he inculpates himself for the unlawful imprisonment first degree, as an E Felony. As I see that. All right? I'm not saying he's guilty of kidnapping; I'm not saying he's guilty of assault second degree; but I am saying this: He's already inculpated himself to the extent of unlawful imprisonment first degree.

client's testimony with a business record." (T. Tr. at 25:8–14).

**2.** Later on appeal, the trial court would be reversed in this respect, as the Appellate Division would hold that the kidnapping charge should have been merged into the assault and attempted rape charges. *See People v. McMahon*, 248 A.D.2d 642, 669 N.Y.S.2d 951, 951 (2d Dep't 1998), *lv. denied*, 92 N.Y.2d 928, 680 N.Y.S.2d 469, 703 N.E.2d 281 (1998).

He's already done that. I see that from the record—

DEFENSE COUNSEL: Well, Judge—

THE COURT:—and I've heard the testimony. I don't know—

DEFENSE COUNSEL: I'm flabbergasted that a judge would make these statements on the record.

THE COURT: Why?

DEFENSE COUNSEL: Because I'm about to commence a trial and you're the trial judge, and you've expressed the opinion, unwavering opinion—

THE COURT: From what I can see from the facts of this case, that your client—having sat through the trial of the co-defendant—that the People have the ability to prove him guilty beyond a reasonable doubt. They have that ability. . . .

As a judge, I'm totally fair and impartial, and I make my rulings fairly and impartially. I'm just saying I heard the evidence in this case already.

DEFENSE COUNSEL: All right, Judge. But you're scaring me a little bit in the area of fairness and impartiality. If I—if there are, you know, legitimate rulings to be made and issues to be argued, I feel—for the record, I must state that I feel at this point somewhat of a—somewhat at a disadvantage having a trial judge already express his conviction that the client is guilty.

. . . . .

DEFENSE COUNSEL: I'm disturbed, that's all, Judge. And I just want to make a record—and, for the record, not that I mean, you know, any personal disrespect, Judge, but based upon the comments that I've heard, I would ask for the record at least that Your Honor recuse himself from this case.

(*Id.* at 11:23–13:7, 13:20–14:9, 16:16–22).

The court denied the recusal motion. (*Id.* at 18:6–7).

### (iv) *The Sandoval Hearing*

Later that day, the court held a *Sandoval* hearing to discuss the evidence the parties sought to introduce at trial.[3] Again, the subject of Judge Berry's recusal was raised—this time, by the judge himself. Turning to defense counsel, Judge Berry stated:

> By the way, I had mentioned to you when you were disturbed earlier today, before we broke for lunch, that . . . upon reviewing the evidence of the first trial and upon viewing your client's testimony in his Grand Jury proceeding, that I felt that he had already established, by his testimony alone, his guilt. All right? And you were disturbed. Well, you know, I'm not the trier of fact in this case. I am the judge who will moderate and produce a fair and impartial trial. Now, if, in fact, you wanted to have a non-jury trial, I would—could arrange to have a judge here to try the case non-jury if you felt that that right was being impeded at this time. Do you feel that that's being impeded? Is there a desire for a non-jury trial?

(*Id.* at 32:7–33:6). Counsel requested time to discuss the matter with his client. The court assented, and shortly thereafter, the following exchange took place:

**3.** In *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), the New York Court of Appeals held that New York courts are required, on motion of the defendant, to make an advance ruling prohibiting the prosecutor from using evidence of a defendant's prior "bad acts" to impeach his credibility where the probative value of such evidence for impeachment is outweighed by the potential prejudice to the defendant. Here, the parties used the hearing to generally discuss the evidence to be presented at trial.

DEFENSE COUNSEL: Judge, I've talked to my client about it and—for a variety of reasons, not really having anything to do with yourself, I think it might be prudent to go with a non-jury trial.

THE COURT: Well, you want to have a non-jury trial here? Then I'll get a judge here. You can waive your right to a jury trial at this time, and he'll probably take opening statements and the trial may well commence. Once that happens, you know, you cannot then elect to go back to a jury trial. You understand that?

DEFENSE COUNSEL: Oh, I understand, Judge.

THE COURT: All right. And if you're telling me you don't want me to try this case non-jury—

DEFENSE COUNSEL: I—that would be my feeling. Just because—to avoid any appearance—

THE COURT: Well, I mean, I did hear all the facts in the other case, and I have read his Grand Jury testimony. And, like I told you, from what I can discern from everything, there is a distinct, you know, proof in this record that your client has admitted doing the unlawful imprisonment first degree. You know, it's loud and clear to me.

DEFENSE COUNSEL: That's why I would prefer to sort of submit the thing to a different judge. I understand your feelings and, you know, I don't hold any of that against you. If this were to proceed as a non-jury, I'm sure that—you know, that wouldn't affect the process. But for a variety of reasons, at this juncture, it may be prudent. I mean, some of the allegations in this case are somewhat inflammatory. And there's the presence of a jury, has somewhat of an inhibiting effect on the ability to, you know, cross-examine under these circumstances, whereas without a jury

there, a judge is in a better position to, you know, disregard what's irrelevant and prejudicial, and to—to, you know, hear the matter out. And I do have a—a lot of evidence which a judge could disregard, or he could consider it. And that would be at his discretion. Rather than being prohibited from getting into certain areas at all.

(*Id.* at 34:15–20, 35:10–37:14).

### (v) *The Jury Waiver*

After the potential jurors had been excused from service, the parties appeared before County Court Judge Robert R. Meehan to execute the waiver of jury trial. Judge Meehan confirmed for the record that McMahon's case had been transferred from Judge Berry to him, and confirmed that the defense had an application to make. McMahon's counsel then made his application to waive a jury trial and asked that the case be tried to the court. Defense counsel gave no explanation for why McMahon was waiving his right to a jury, and no mention was made of the recusal motion.

The court explained to McMahon his right to be tried by a jury and the consequences of waiving that right; defense counsel also discussed with his client the written waiver of jury trial provided by the court. McMahon executed the waiver. The court then accepted the waiver, and scheduled McMahon's case for trial. (*Id.* at 40:10–44:25).

### b. *McMahon's Non–Jury Trial*

McMahon's case was tried to the court on June 20, 1996. On June 28, 1996, Judge Meehan found McMahon guilty of kidnapping in the second degree, attempted rape in the first degree, and assault in the second degree. (*Id.* at 51, 1139–44). On August 27, 1996, Judge Meehan sentenced McMahon to three concurrent two-to-six year terms of imprisonment. (Sentence Tr. at 13–19).

## C. *The Post–Conviction Proceedings*

On September 19, 1997, McMahon appealed his conviction to the Appellate Division, Second Department on grounds that: (1) his conviction was not supported by legally sufficient evidence; (2) the evidence was inadequate as a matter of law; (3) he was denied his right to a fair trial when the court limited his cross-examination of the victim; (4) the court erred in failing to merge his kidnapping conviction into his other convictions; and (5) he was denied his right to a jury trial by the court's conduct. (*See* Resp't Opposing Decl. Ex. B). On March 23, 1998, the Second Department found that the trial court erred in declining to merge McMahon's kidnapping conviction into his assault and attempted rape convictions. *People v. McMahon*, 248 A.D.2d 642, 669 N.Y.S.2d 951, 951 (2d Dep't 1998), *lv. denied*, 92 N.Y.2d 928, 680 N.Y.S.2d 469, 703 N.E.2d 281 (1998). It therefore modified the trial court's August 27, 1996 judgment by reversing the kidnapping conviction and vacating the sentence; that count of the indictment was also dismissed. Id. The court found McMahon's other contentions to be without merit and the trial court's judgment was otherwise affirmed. Id.

On April 29, 1998, McMahon moved by order to show cause for leave to reargue the Appellate Division's partial denial of his appeal. The motion was denied. (*See* Resp't Opposing Decl. Exs. H, J). On May 25, 1998, McMahon sought leave to appeal to the New York Court of Appeals. This application was also denied. *People v. McMahon*, 92 N.Y.2d 928, 680 N.Y.S.2d 469, 703 N.E.2d 281 (1998).

## D. *Proceedings in This Court*

McMahon filed a petition for a writ of habeas corpus in this Court on September 29, 1999.[4] On June 28, 2000, the Court (then-District Judge Parker) ordered that the case be referred to a magistrate judge for a report and recommendation on the petition. Magistrate Judge Smith issued a report and recommendation on September 18, 2000, recommending that the petition be dismissed and a writ of habeas corpus denied. McMahon filed his written objections to the report and recommendation on November 9, 2000.

This case was reassigned to me on November 1, 2001. Thereafter, I ordered the respondents to respond to petitioner's objections to the Magistrate Judge's report and recommendation, specifically focusing on whether: (1) petitioner's due process rights were violated because the trial judge had prejudged the case; and (2) petitioner was denied his right to a jury because the trial judge conditioned his recusal on petitioner's consent to a bench trial. *See McMahon v. Hodges, et al.*, No. 99 Civ. 10116 (S.D.N.Y. Feb. 8, 2002). Respondents submitted their response on March 21, 2002, and on April 9, 2002, McMahon submitted a reply thereto.[5]

---

**4.** McMahon filed a habeas petition *pro se* on September 16, 1999, which was assigned docket number 99 Civ. 9749(BDP). On September 29, 1999, McMahon's counsel from the state court proceedings also filed the instant habeas petition on McMahon's behalf, assigned docket number 99 Civ. 10116(BDP). By letter dated January 20, 2000, McMahon informed the Court that he wished to withdraw his *pro se* petition and proceed instead with the petition filed by his attorney. By letter dated March 21, 2000, McMahon's counsel confirmed with the Court his client's intent, as well as the respondents' acquiescence. Accordingly, case number 99 Civ. 9749(BDP) was closed; this Court therefore does not address the arguments raised in that petition, nor the responses thereto.

**5.** Although McMahon is currently released on parole and no longer "in custody," he was incarcerated "at the time the petition was filed, which is all the 'in custody' provision of 28 U.S.C. § 2254 requires." *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d

## DISCUSSION

McMahon petitions this Court for a writ of habeas corpus, claiming that his due process rights and his right to a jury trial were violated because the trial court coerced him into waiving his right to a jury. Specifically, the claim raises two issues for review: first, whether McMahon's due process rights were violated because the first trial judge was biased and prejudiced against him; and second, whether McMahon's due process rights and his right to a jury trial were violated by the judge's conditioning his recusal on McMahon's waiver of his right to a jury. Before I address these issues, however, I first address the appropriate standard of habeas corpus review under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

### A. Standard of Review

In enacting AEDPA, Congress altered the landscape of habeas jurisdiction and "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). AEDPA's deferential standard of review provides that a habeas petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

■ Under AEDPA, first, I consider whether the federal constitutional claim raised in this habeas petition was "adjudicated on the merits" by the state court. A state court adjudicates a petitioner's claims "on the merits" when it disposes of the claim on the merits and reduces its disposition to judgment. *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir.2002) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001)). In addition, the Second Circuit has held that the state court "need not mention the argument raised or cite relevant case law in order for its ruling to constitute an 'adjudication on the merits.'" *Brown*, 283 F.3d at 498 (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93–94 (2d Cir.2001)).

■ In this case, McMahon's federal constitutional claim was "adjudicated on the merits" by the Appellate Division, Second Department: after specifically addressing McMahon's other claims, the court dismissed the federal constitutional claim raised here by stating, "defendant's remaining contention is without merit." *McMahon*, 669 N.Y.S.2d at 951. Finding "no basis either in the history of the case or the opinion of the Appellate Division" to believe that McMahon's federal constitutional claim was denied on procedural or other nonsubstantive grounds, I conclude that this claim was "adjudicated on the merits" by the state court. *Brown*, 283 F.3d at 498.

43 (1998) (citations omitted). Moreover, the petition still presents a "case-or-controversy" under the Constitution because McMahon continues to experience "collateral consequences" from the wrongful conviction. *Id.* ("[petitioner] must continue to have a personal stake in the outcome of the lawsuit") (cita-

tion and internal quotation marks omitted). For example, McMahon must comply with the requirements of New York's Sex Offender Registration Act. *See* N.Y. Correct. Law § 168 (McKinney 2002). Accordingly, the petition is not rendered moot by McMahon's release.

Second, I consider whether the state court's decision was "contrary to" or involved an "unreasonable application" of federal constitutional law as determined by the Supreme Court.

A federal court may grant a habeas petition under the "unreasonable application" prong "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. The Supreme Court has observed that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410, 120 S.Ct. 1495. There must be " '[s]ome increment of incorrectness beyond error,' although 'the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Brown,* 283 F.3d at 501 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). The relevant inquiry under this prong is therefore "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

Applying this standard, I conclude that the state court's decision in this case involved an "unreasonable application" of clearly established federal constitutional law as to the issue of the waiver of McMahon's right to a jury trial but not as to the issue of the trial judge's fairness and impartiality. As discussed below, by conditioning its recusal on McMahon's waiver of his right to a jury, the trial court unduly fettered McMahon's ability to exercise that right. McMahon's waiver of his right to a jury trial was therefore rendered involuntary.

The federal law upon which McMahon's habeas petition relies was "clearly established" by Supreme Court precedent at the time the state court trial judge secured McMahon's waived of his constitutional right to a trial by jury. Discussed further below, it is axiomatic that the right to a jury trial in serious criminal cases is a fundamental constitutional right that must be "jealously preserved." *Patton v. United States,* 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930), *abrogated in part on other grounds, Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (upholding jury trial of 6 rather than 12 jurors); *accord Duncan v. Louisiana,* 391 U.S. 145, 157–58, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) ("a general grant of jury trial for serious offenses is a fundamental right, essential for·preventing miscarriages of justice and for assuring that fair trials are provided for all defendants"); U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI.

I conclude that the state court's determination that McMahon's constitutional claim was "without merit" involved an unreasonable application of federal constitutional law. In rejecting this claim, the court unreasonably failed to apply clearly established federal constitutional law that was both relevant and applicable to McMahon's claim.

### B. *The Trial Court's Alleged Bias and Prejudice*

The first issue raised by this habeas petition is whether McMahon's due process rights were violated because the state court trial judge was biased and prejudiced against him. McMahon argues that due process entitled him to be tried before a court that had not pre-judged the issues in his case and concluded—before trial—that he was already guilty. For the reasons set forth below, McMahon has failed to show that his due process rights were violated.

### 1. Applicable Law

■ " 'A fair trial in a fair tribunal is a basic requirement of due process.' " *Peters v. Kiff,* 407 U.S. 493, 501, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). Although the Constitution does not address every issue of judicial qualification, the Due Process Clause of the Fourteenth Amendment establishes minimum constitutional requirements of fairness. The Supreme Court has also recognized, however, that "it is normally within the power of the State to regulate procedures under which its laws are carried out." *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (quoting *Patterson v. New York,* 432 U.S. 197, 201–02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). On review of a habeas petition, the relevant inquiry is whether the allegations of bias and prejudice offend the Due Process Clause of the United States Constitution. Because a trial judge must first comply with state law, however, and for additional guidance as to what is reasonable, I evaluate the trial judge's conduct under both constitutional and state law standards.

### a. Federal Law

In *Aetna Life Ins. Co. v. Lavoie,* the Supreme Court observed that " '[m]ost matters relating to judicial disqualification [do] not rise to a constitutional level.' " 475 U.S. at 820, 106 S.Ct. 1580 (quoting *FTC v. Cement Inst.,* 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)). Where the grounds for disqualification involve bias or prejudice, the Court has held that "only in the most extreme of cases would

disqualification ... be constitutionally required." *Aetna,* 475 U.S. at 821, 106 S.Ct. 1580. Mandatory judicial recusal for bias did not exist at common law, and a statutory provision requiring a district judge's recusal for bias was not enacted until 1911. *Liteky v. United States,* 510 U.S. 540, 543–44, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).[6] On the other hand, federal statutes have required judicial recusal when a judge has an "interest" in an action since 1792. *Id.* In *Tumey v. Ohio,* the Supreme Court held that "it certainly violates the Fourteenth Amendment" to subject an individual's liberty or property to the judgment of a court where the judge has a direct, personal, substantial, or pecuniary interest in reaching a particular result. · 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

The Supreme Court has held that a judge's opinion resulting from prior proceedings involving the same parties is not a "basis for a bias or partiality motion unless [the opinion] display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. In fact, "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Id.* at 551, 114 S.Ct. 1147. Similarly, the Second Circuit has held that "[d]isqualification is warranted and appropriate only if the alleged bias and prejudice stems from an extrajudicial source," resulting in an opinion on the merits not based on what the judge has learned through the judicial proceedings. *United States v. Sclafani,* 487 F.2d 245, 255 (2d Cir.1973) (citing *United*

---

6. *See* 28 U.S.C. § 144 (1994) (providing for automatic disqualification of district judges when a party submits a timely and legally sufficient affidavit attesting that the judge has "a personal bias or prejudice" against her). *See also* 28 U.S.C. § 455 (1994) (providing broader grounds for disqualification of a Unit-

ed States justice, judge, or magistrate judge, including situations "in which his impartiality might reasonably be questioned"). These statutes provide more protection against judicial bias and prejudice than the federal Constitution.

*States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).[7] Thus, the "rule of law" in this circuit is that:

> what a judge learns in his judicial capacity—whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both—is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification.

*United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir.1976).

### b. *New York Law*

■ In New York, statutory grounds for disqualification are set forth in New York Judiciary Law § 14, entitled "Disqualification of Judge By Reason of Interest or Consanguinity." In addition, New York's Code of Judicial Conduct provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," including instances where "the judge has a personal bias or prejudice concerning a party." N.Y. Jud. Law Canon 3(E)(1) (McKinney 1996); N.Y. Comp. Codes R. & Regs. tit. 22 § 100.3(E)(1) (same); *see also* N.Y. Comp.Codes R. & Regs. tit. 22 § 700.5(c) ("A judge shall preside at such trial unless he is satisfied, upon challenge or *sua sponte,* that he is unable to serve with complete impartiality, in fact or appearance, with regard to the matter at issue or the parties involved."). Because questions of recusal are decided by the judge whose recusal is sought, *People v. T & C Design, Inc.,* 178 Misc.2d 971,

680 N.Y.S.2d 832, 833 (1998), judges should "consider the over-all situation and, if they see no bias or prejudice ... over the matter, they may sit on the matter absent an abuse of discretion." *People v. Page,* 183 Misc.2d 370, 702 N.Y.S.2d 552, 554 (2000) (citation omitted).

■ Absent statutory grounds, the trial judge is the "sole arbiter of recusal"; the decision whether to recuse oneself is discretionary—"within the personal conscience of the court." *People v. Moreno,* 70 N.Y.2d 403, 405–06, 521 N.Y.S.2d 663, 516 N.E.2d 200 (1987) (citation omitted). Further, the New York Court of Appeals has observed that, absent statutory grounds, a trial judge's alleged bias, prejudice, or unworthy motives will not constitute grounds for recusal unless shown to affect the result. *Id.* at 407, 521 N.Y.S.2d 663, 516 N.E.2d 200 (citation omitted); *see also People v. Brown,* 141 A.D.2d 657, 529 N.Y.S.2d 552, 554 (2d Dep't 1988) (citing *Moreno,* 70 N.Y.2d at 407, 521 N.Y.S.2d 663, 516 N.E.2d 200). In fact, even where recusal may be the "better practice ... to maintain the appearance of impartiality," the judge is still the "sole arbiter" of the decision. *Moreno,* 70 N.Y.2d at 406, 521 N.Y.S.2d 663, 516 N.E.2d 200. Finally, in New York, prior familiarity with either the defendant or the case does not require recusal; like federal law, there is no prohibition against the same judge conducting a pretrial hearing and the trial itself, or a suppression hearing and a non-jury trial. *Moreno,* 70 N.Y.2d at 406, 521 N.Y.S.2d 663, 516 N.E.2d 200 (collecting cases).

---

**7.** In *Liteky,* the Court observed that "[i]t is wrong in theory ... to suggest, as many opinions have, that 'extrajudicial source' is the *only* basis for establishing disqualifying bias or prejudice." 510 U.S. at 551, 114 S.Ct. 1147. Because the presence of an extrajudicial source does not necessarily establish bias—nor does its absence necessarily pre-

clude it—the Court cautioned against rote adherence to an "extrajudicial source *doctrine*" in recusal jurisprudence. Rather, the Court encouraged viewing the existence of such a source as a factor. *Id.* at 554–55, 114 S.Ct. 1147; *see also In re Int'l Business Machines Corp.,* 45 F.3d 641, 644 (2d Cir.1995).

## 2. *Application*

 Applying these principles to the case at hand, I conclude that, under both federal constitutional and New York law, McMahon's due process rights were not violated, and the trial judge's recusal for bias or prejudice was not warranted.

### a. *Constitutional Standards*

I conclude that federal constitutional standards were not violated, for the following reasons.

First, although the trial judge was exceedingly blunt, his comments were not inappropriate in the context in which they were made, *i.e.*, the plea bargaining process. In the federal system, trial judges are prohibited from participating in plea negotiations, *see* Fed.R.Crim.P. 11(e), and this case well illustrates why. The federal rule reflects the recognition that a trial judge's participation in plea bargaining is inherently coercive; the rule is designed, therefore, to eliminate the pressures deriving from judicial participation in the plea bargaining process. *See, e.g., United States v. Barrett,* 982 F.2d 193, 194 (6th Cir.1992) ("The primary reason for Rule 11 is that a judge's participation in plea negotiation is inherently coercive."); *United States v. Bruce,* 976 F.2d 552, 556 (9th Cir.1992) ("judicial involvement in plea negotiations inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement").

 Rule 11 does not apply, however, to the state courts. *See, e.g., Miles v. Dorsey,* 61 F.3d 1459, 1466–67 (10th Cir.1995) (noting Rule 11 does not apply to state courts and does not establish a constitutional prohibition against plea bargaining in state courts); *Frank v. Blackburn,* 646 F.2d 873, 882 (5th Cir.1980) ("Rule 11 is not binding on the states"). In New York, state court judges do participate in plea discussions. Thus, by participating in plea discussions with the parties, the trial judge here violated no state court rule.

Here, the trial judge's comments undoubtedly were designed to induce McMahon to take a plea, but the state court system permits a judge to participate in such negotiations. Indeed, here, defense counsel invited *ex parte,* off-the-record discussions with the court. The trial judge was familiar with the evidence; he gave McMahon and his lawyer an appraisal of their case, a prediction on the likely outcome of a trial, and an explanation of the risks attendant to going to trial as opposed to pleading guilty. McMahon did not like what he heard, but the trial judge, as an experienced, impartial arbiter, was merely giving his assessment to help the parties evaluate their options, as the state court system contemplates. While the trial judge's statements placed significant pressure on McMahon to plead guilty, as a matter of constitutional law, I conclude that McMahon's due process rights were not violated.

Second, although the trial judge apparently had formed views about the evidence and McMahon's exposure, the judge acquired the information in the course of the proceedings in the case and he was not recusable on this basis. Unless a judge displays a "deep-seated favoritism or antagonism that would make fair judgment impossible," "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. In fact, a judge may become "exceedingly ill disposed towards the defendant[ ] who has been shown to be a thoroughly reprehensible person" during prior proceedings; the judge is not, how-

ever, recusable for bias or prejudice on this basis. *Id.* at 550–51, 114 S.Ct. 1147.[8]

Third, the trial judge concluded that he could be fair and impartial if he were to preside over McMahon's trial, and McMahon has not shown any basis to disbelieve the judge's conclusion. I am not persuaded that the trial judge would have let his rulings on evidentiary matters be improperly influenced by whatever views he might have had with respect to the strength of the evidence; I am not persuaded that the judge would have retaliated against McMahon for refusing to plead guilty. Consequently, McMahon cannot establish that any alleged bias or prejudice on the trial judge's part actually deprived him of due process of law.

Hence, the trial court's initial decision to deny recusal was neither contrary to, nor involved an unreasonable application of, clearly established federal law. The recusal decision, by itself, provides no basis for habeas relief.

### b. *State Law*

State law compels the same result. In *Moreno*, the New York Court of Appeals held that a judge, unlike a jury, " 'by reasons of … learning, experience and judicial discipline, is uniquely capable of … making an objective determination' based upon appropriate legal criteria, despite awareness of facts" not properly relied upon in making the decision. *Moreno,* 70 N.Y.2d at 406, 521 N.Y.S.2d 663, 516 N.E.2d 200 (quoting *People v. Brown,* 24 N.Y.2d 168, 172, 299 N.Y.S.2d 190, 247 N.E.2d 153 (1969)). There, the court affirmed the trial judge's decision refusing to recuse itself, although the judge had conducted a *Sandoval* hearing and then presided over a non-jury trial. Following *Moreno,* courts have held that recusal was not warranted where the judge: witnessed an assault between the parties in his robing room, about which he was subpoenaed to testify at a separate trial, and later presided over a separate post-judgment non-jury proceeding, *Conti v. Citrin,* 239 A.D.2d 251, 657 N.Y.S.2d 678 (1st Dep't 1997); had previously prosecuted the defendant, *People v. Jones,* 143 A.D.2d 465, 532 N.Y.S.2d 586 (3d Dep't 1988); or had previously authorized the search warrant he was later called upon to invalidate, *People v. Tambe,* 71 N.Y.2d 492, 527 N.Y.S.2d 372, 522 N.E.2d 448 (1988).[9]

---

**8.** In *Liteky,* the Supreme Court noted that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display[ ]" do not establish bias or impartiality. 510 U.S. at 555–56, 114 S.Ct. 1147. On the other hand, a judicial remark during the course of trial that " '[o]ne must have a very judicial mind, indeed, not to be prejudiced against the German–Americans' because 'their hearts are reeking with disloyalty[ ]' " would reveal such a high degree of antagonism as to make fair judgment impossible. *Id.* at 555, 114 S.Ct. 1147 (quoting *Berger v. United States,* 255 U.S. 22, 28, 41 S.Ct. 230, 65 L.Ed. 481 (1921)).

**9.** The Appellate Division reached a different result in *People v. Zappacosta,* finding that the "amalgam of peculiar circumstances" in the case warranted recusal. 77 A.D.2d 928, 431

N.Y.S.2d 96, 99 (2d Dep't 1980). In *Zappacosta,* defendant's wife, a codefendant, pled guilty. *Id.* at 98. During her plea allocution, the trial judge "actively elicited statements" that incriminated the defendant, which were not necessary to the taking of the plea. *Id.* In addition, the statements constituted "information on the ultimate issue of appellant's guilt which the court, as trier of fact, would not otherwise have had." *Id.* The Appellate Division drew an analogy to the rule permitting an individual who withdraws a guilty plea to request a trial before a different judge, and held that the recusal motion should have been granted. *Id.* The Court of Appeals discussed *Zappacosta* in *Moreno,* and concluded: "That exceptional case may not be read to have erected an objective appearance of impropriety test premised on a presumption of irregularity or bias." 70 N.Y.2d at 407, 521 N.Y.S.2d 663, 516 N.E.2d 200.

Absent statutory grounds, therefore, the judge is the "sole arbiter of recusal" under New York law. *Moreno,* 70 N.Y.2d at 405–06, 521 N.Y.S.2d 663, 516 N.E.2d 200. This is so even where, as here, recusal may have been advisable "to maintain the appearance of impartiality." *Id.* at 406, 521 N.Y.S.2d 663, 516 N.E.2d 200. Given the judge's certainty that he could be fair and impartial, and because the decision was discretionary, I conclude that the trial judge here was not required to recuse himself under New York law.

## C. *Waiver of Right to Jury Trial*

The second issue raised by this habeas petition is whether McMahon's due process rights and his right to a jury trial were violated when the trial court linked its granting of the recusal motion to McMahon's waiver of his right to a jury. For the reasons set forth below, I conclude that by conditioning its recusal on McMahon's waiver of his right to a jury, the trial court committed constitutional error.

### 1. *Applicable Law*

### a. *Right to Trial By Jury*

■ The Constitution has established trial by jury as the " 'normal and ... preferable mode' " of resolving issues of fact in criminal cases. *Singer v. United States,* 380 U.S. 24, 35, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) (citation omitted). The right to trial by jury for serious offenses is a fundamental right, "essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants." *Duncan v. Louisiana,* 391 U.S. 145, 157–58, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). This right was " 'designed to guard against a spirit of oppression and tyranny on the part of rulers, and was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties.' " *Neder v. United States,* 527

U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *United States v. Gaudin,* 515 U.S. 506, 510–11, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (internal citation and quotation marks omitted)); *Apprendi v. New Jersey,* 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Supreme Court has explained:

> Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge .... [T]he jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge ....

*Duncan,* 391 U.S. at 156, 88 S.Ct. 1444.

■ So vital is the right to a trial by jury that its deprivation constitutes a "structural defect[ ] in the constitution of the trial mechanism" necessarily rendering a trial fundamentally unfair. *Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Errors of this type are "so intrinsically harmful as to require automatic reversal ... without regard to their effect on the outcome." *Neder,* 527 U.S. at 7, 119 S.Ct. 1827; *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (noting that some basic trial rights can never be treated as harmless error). Indeed, errors of this type " 'infect the entire trial process,' " *Neder,* 527 U.S. at 8, 119 S.Ct. 1827 (quoting *Brecht,* 507 U.S. at 630, 113 S.Ct. 1710), and "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair.' " *Id.* at 8–9, 119 S.Ct. 1827 (quoting *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)).[10] *See also Greer v.*

---

10. The Supreme Court has found structural error in only limited circumstances: (1) a

*Miller,* 483 U.S. 756, 768, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (Stevens, J., concurring in judgment) (describing category of constitutional errors "so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained") (internal citation and quotation marks omitted).

In *Sullivan,* the Court addressed the deprivation of a companion right: the denial of the right to a jury verdict of guilt beyond a reasonable doubt. The Court held that error to be structural, as "the jury guarantee [is] a 'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." 508 U.S. at 281, 113 S.Ct. 2078 (citing *Rose,* 478 U.S. at 577, 106 S.Ct. 3101). The Court then observed that the right to trial by jury reflects " 'a profound judgment about the way in which law should be enforced and justice administered.' " *Id.* (quoting *Duncan,* 391 U.S. at 155, 88 S.Ct. 1444). Finally, it concluded that "[t]he deprivation of *that* right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.' " *Id.* at 281–82, 113 S.Ct. 2078 (emphasis added). *See also United States v. Harbin,* 250 F.3d 532, 543 (7th Cir.2001) (noting structural errors are reversible *per se,* such as denial of right to jury trial) (citation omitted); *McGurk v. Stenberg,* 163 F.3d 470, 474 (8th Cir.1998) (conclud-

ing that denial of jury trial is structural error subject to automatic reversal).

In view of these principles, the " 'right of the accused to a trial by a constitutional jury [must] be jealously preserved.' " *Singer v. United States,* 380 U.S. 24, 34, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) (quoting *Patton v. United States,* 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930)).

### b. *Waiver*

■■■■■■ Courts will not "presume acquiescence in the loss of fundamental rights"; in fact, courts "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (citations and internal quotation marks omitted); *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). Waiver has been described as the "intentional relinquishment or abandonment of a known right or privilege." *Zerbst,* 304 U.S. at 464, 58 S.Ct. 1019. Whether there has been an "intelligent, competent, self-protecting waiver of jury trial" depends on the totality of the circumstances of each particular case. *Adams v. U.S. ex rel. McCann,* 317 U.S. 269, 278, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

■■■■ At bottom, the surrender of any fundamental constitutional right must reflect the unfettered choice of the defendant. *Parker v. North Carolina,* 397 U.S. 790, 801, 90 S.Ct. 1458, 25 L.Ed.2d 785

biased presiding judge, *see Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); (2) the total deprivation of the right to counsel at trial, *see Gideon v. Wainwright,* 372 U.S. 335, 344–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); (3) the denial of the right to self-representation at trial, *see McKaskle v. Wiggins,* 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); (4) the denial of the right to a public trial, *see Waller v. Georgia,* 467 U.S. 39, 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31

(1984); (5) the systematic exclusion of members of the defendant's own race from a grand jury, *see Vasquez v. Hillery,* 474 U.S. 254, 262–63, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); (6) the denial of the right to have a district judge (rather than a magistrate judge) preside over jury selection, *see Gomez v. United States,* 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989); and (7) a defective reasonable doubt instruction, *see Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

(1970) (Brennan, J., dissenting) (citations omitted). Courts focus on whether waiver was voluntarily and intelligently made, with full understanding of the consequences. *Adams,* 317 U.S. at 278, 63 S.Ct. 236. This inquiry necessarily includes exploration of whether "any illicit pressures have been brought to bear on a defendant." *Parker,* 397 U.S. at 801, 90 S.Ct. 1458. Indeed, a waiver of the right to a jury trial is not valid if it is the product of duress or coercion, *Adams,* 317 U.S. at 275, 63 S.Ct. 236, or if induced by misrepresentation or improper promises. *United States v. Nelson,* 277 F.3d 164, 206–07 (2d Cir.2002) ("as *Brady* says, [for waiver to be valid,] the quid pro quo must be both *ful[fillable] and proper*") (citing *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).

In analogous contexts, addressing the waiver of constitutional rights, the Court has held that a guilty plea (and the attendant waiver of the right to a jury) may be rendered involuntary where the defendant, "while perfectly capable of rational choice, has been confronted with factors that the government may not constitutionally inject into the decision-making process." *Parker,* 397 U.S. at 802, 90 S.Ct. 1458; *see Brady,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) ("[A]gents of the State may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant."). A confession may also be held involuntary if, although the " 'product of a sentient choice,' it does not reflect a free exercise of the defendant's will." *Parker,* 397 U.S. at 803, 90 S.Ct. 1458 (quoting *Haley v. Ohio,* 332 U.S. 596, 603, 68 S.Ct. 302, 92 L.Ed. 224 (1948)). The Court has thus recognized that "certain promises of leniency or threats of harsh treatment by the trial judge or the prosecutor unfairly burden or intrude upon the defendant's decision-making process." *Parker,* 397 U.S. at 802, 90 S.Ct. 1458.

### 2. *Application*

■ Here, I conclude that McMahon's waiver of his right to a jury trial was not voluntary, for he labored under undue pressure in making his decision. The trial court erred when it linked its recusal to McMahon's waiver of his right to a jury trial, rendering the waiver void. I base my conclusion on the following.

Although the trial judge's recusal was not legally required, McMahon's fear that the judge had prejudged his case was not unreasonable. The trial judge told McMahon, for example, that he had "sat through the trial of this case already" and that there was "powerful evidence" against McMahon. He further stated that he had read McMahon's grand jury testimony and that in that testimony McMahon had established his own guilt as to the unlawful imprisonment charge. As a result of these and other comments, McMahon feared that a different judge was essential if he was to receive a fair trial.

Defense counsel voiced his concerns to the judge a number of times, stating that the trial judge was "scaring [him] a little bit in the area of fairness and impartiality" and that he felt "at a disadvantage having a trial judge already express his conviction that the client is guilty." (T. Tr. at 13:24–14:9). Even though the trial judge believed these concerns to be unfounded, he knew that they existed: counsel stated to the judge "based upon the comments that I've heard, I would ask for the record at least that Your Honor recuse himself from this case." (*Id.* at 16:16–22). The trial judge denied the recusal motion, but later, when the parties reconvened, the judge reconsidered. Knowing that his recusal was ardently sought, the trial judge offered to give McMahon what he wanted—but only *if* he waived his right to a jury trial. (*See id.* at 32:25–36:6) ("I would—could arrange to have a judge here to try the case non-jury if you felt that that right

was being impeded at this time. Do you feel that that's being impeded? Is there a desire for a non-jury trial?"). In thus fashioning McMahon's options, however, the trial judge unduly constrained McMahon's ability to make a voluntary choice.

In fact, McMahon had no meaningful "choice": he could "choose" a jury trial with a judge whom he perceived to be biased against him, or he could "choose" a different judge and give up his fundamental right to be tried by a jury. The trial judge thus leveraged McMahon's fear that he had prejudged his case to induce McMahon to waive his right to a jury. *See Garrity v. New Jersey,* 385 U.S. 493, 498–99, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (finding the "choice" given employees under investigation of either forfeiting their jobs or incriminating themselves to be "the antithesis of free choice," coercive, and involuntary; "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other") (citation omitted).

Defendants often waive their fundamental rights in criminal cases; every time a defendant pleads guilty, of course, he waives numerous rights, including the right to defend against the charges. In doing so, however, the defendant receives in return a tangible benefit that he otherwise might not have—for example, a lighter sentence, an opportunity to show that he has accepted responsibility, or perhaps the dismissal of other charges. In this case, McMahon gave up an important right, his right to trial by jury, but he received no benefit in return—he was already entitled to have both a fair and

impartial judge preside over his case and a trial by jury. *See Lefkowitz v. Cunningham,* 431 U.S. 801, 807–08, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (finding violation of constitution where statute required "forfeit[ure of] one constitutionally protected right as the price for exercising another"); *United States v. Jimenez,* 921 F.Supp. 1054, 1057 (S.D.N.Y.1995) (Sotomayor, J.) (holding, in case where immigration judge suggested that alien would be incarcerated rather than released on parole if he contested deportation, "the linking by a judge of indefinite imprisonment to failure to waive a fundamental right infects the entire proceeding with a coercive stench ... [and any] waiver extracted thereafter can only be considered void").

At the trial court's suggestion, McMahon bargained away an important right in return for the granting of his recusal motion—and while the trial judge arranged for a different judge to try McMahon's case, this consideration was not so "utterly free from taint" as to overcome the " 'presumption against the waiver of constitutional rights.' " *Nelson,* 277 F.3d at 206 (quoting *Brookhart,* 384 U.S. at 4, 86 S.Ct. 1245); *see People v. White,* 155 A.D.2d 953, 547 N.Y.S.2d 768, 770 (4th Dep't 1989), *appeal denied,* (Green, J., dissenting) ("The court's recusal, conditioned on defendant's waiver of a jury trial before another judge, deprived defendant of his constitutional right to a jury trial. There is no authority for such a condition. A defendant's right to a jury trial is fundamental and may not be waived absent a demonstration that the waiver was knowingly and voluntarily made.") (citation omitted).[11]

---

**11.** In *White,* the majority rejected a defendant's claim that he had been forced to forego a jury trial by the court's conditioning of its recusal on a waiver of a right to a jury, but it did so on the facts, noting that the defendant had not asked the trial court to recuse itself from a jury trial. The case is distinguishable because the defendant (1) sought to exercise his right under the New York State Constitution to be tried by a judge rather than a jury, New York Const., art. I, § 2, and (2) subsequently moved for the judge's recusal after the defendant withdrew the guilty plea he had entered before that judge. Recusal is warranted under the New York rule permitting an individual who withdraws a guilty plea to

By linking its granting of the recusal motion to McMahon's waiver of his fundamental right to a jury, the trial court committed constitutional error, for constitutional rights cannot be used as bargaining chips in this manner.

Respondent argues that McMahon elected to waive his right to a jury for tactical reasons, after consulting with his attorney. (Resp't Opp'n Pet. at 13, 17). McMahon insists, however, that the "tactical explanations" were merely excuses offered *after* he decided to waive his right to a jury, to have his case transferred to a different judge. Thus, these explanations were offered by counsel to appease the judge in case counsel was to appear before the judge again. In other words, McMahon's counsel contends that he sought to placate the judge after he had moved for his recusal by stating that he was sure the judge could be impartial—but that he really believed otherwise. (*See* T. Tr. at 36:16–25) ("That's why I would sort of prefer to submit the thing to a different judge . . . . I don't hold any of that against you. If this were to proceed as a non-jury [before you], I'm sure that—you know, that it wouldn't affect the process. But, for a variety of reasons, at this juncture, it may be prudent."). Although counsel did his client a disservice by trying to appease the judge, I accept his representation that the motivating factor in the decision to waive a jury was the desire to be before a different judge. In fact, the record confirms that McMahon sought both a different judge *and* a trial by jury. (*See* Pet'r Obj. ¶ 40).

Believing this was not an option, however, McMahon reluctantly waived his right to a jury.[12]

McMahon has suffered prejudice as a result of the involuntary waiver of his right to a jury. Although the evidence in the case—including the testimony of the victim—demonstrates that McMahon was not the main actor and was less culpable than Hall, McMahon was convicted of attempted rape by a judge while a jury acquitted Hall on that very charge. In hindsight, McMahon might very well have fared better by exercising his constitutional right to a jury. More significantly, prejudice is presumed, for the jury guarantee is considered a "basic protection" of our Constitution, "without which a criminal trial cannot reliably serve its function." *Sullivan*, 508 U.S. at 281, 113 S.Ct. 2078 (citation omitted). The constitutional error in this case was structural, and thus automatic reversal is required. *Id.* at 275, 113 S.Ct. 2078.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is granted. McMahon's assault and attempted rape convictions are vacated, as is his waiver of his right to a jury trial.

SO ORDERED.

---

request a trial before a different judge. *See People v. Selikoff*, 35 N.Y.2d 227, 239, 360 N.Y.S.2d 623, 318 N.E.2d 784 (1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975). In *White*, the defendant was content to have the judge preside over the trial, as long as it was a jury trial. Thus, the majority decision in *White* does not address the voluntariness of a jury waiver where a defendant seeks recusal of a judge presiding

over a *jury* trial and recusal is then conditioned on waiver of the right to a jury. 547 N.Y.S.2d at 769.

**12.** Judge Berry also told McMahon that once he secured the judge's recusal by waiving his right to a jury, McMahon could not "then elect to go back to a jury trial." (T. Tr. at 35:21–23).